UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NAXOS, LLC, | CASE NO. C18-1287JLR |
| Plaintiff, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| AMERICAN FAMILY INSURANCE COMPANY, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court are three motions for summary judgment:  (1) Defendant American Family Insurance Company's ("AFI") motion for summary judgment on fraud and misrepresentation (Def. MSJ (Dkt. # 56); *see also* Def. Reply (Dkt. # 69)); (2) Plaintiff Naxos, LLC's ("Naxos") cross-motion for summary judgment on fraud and misrepresentation (Pl. Cross Mot. (Dkt. # 67)); and (3) Naxos's motion for partial summary judgment on AFI's liability (Pl. MSJ (Dkt. # 60); *see also* Pl. Reply (Dkt.

# 79)).  Naxos's cross-motion for summary judgment also includes its response to AFI's motion for summary judgment.  (*See* Pl. Cross Mot.)  Naxos also filed a surreply in support of its cross-motion and in opposition to AFI's motion for summary judgment seeking to strike allegedly inadmissible information from AFI's reply brief.  (*See* Pl. Surreply (Dkt. # 72).)  AFI filed a response to Naxos's motion for partial summary judgment.  (*See* Def. Resp. (Dkt. # 73).)  The court has considered the parties' submissions, the relevant portions of the record, and the applicable law.  Being fully advised, the court DENIES AFI's motion for summary judgment, DENIES Naxos's cross-motion for summary judgment, and GRANTS in part and DENIES in part Naxos's motion for partial summary judgment.[1]

## II.    BACKGROUND

### A.    The Sewage Spill

Naxos is a restaurant business run by the Loukas family.  (Loukas Decl. (Dkt. # 61) ¶ 3.)  Naxos owned and operated a restaurant in Kent, Washington, named Spiros

---

[1] Naxos requested oral argument on the motions (*see* Pl. MSJ at 1; Pl. Cross Mot. at 1), but AFI did not (*see* Def. MSJ at 1; Def. Resp. at 1).  A district court's denial of a request for oral argument on summary judgment does not constitute reversible error in the absence of prejudice.  *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (citing *Fernhoff v. Tahoe Reg'l Planning Agency*, 803 F.2d 979, 983 (9th Cir. 1986)).  There is no prejudice in refusing to grant oral argument where the parties have ample opportunity to develop their legal and factual arguments through written submissions to the court.  *Id.* ("When a party has an adequate opportunity to provide the trial court with evidence and a memorandum of law, there is no prejudice [in refusing to grant oral argument] . . . .") (quoting *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991)) (alterations in *Partridge*).  In light of the fact that Naxos has submitted lengthy written submissions and supporting documentation in support of its motions, and the fact that the court denies AFI's motion, the court concludes that denying Naxos's request for oral argument will not prejudice Naxos.  Thus, the court DENIES Naxos's request for oral argument.

Greek Island ("Spiros").  (*See id.*)  On August 5, 2015, over 600 gallons of black water sewage spilled into Spiros and resulted in the shutdown of all business activities at the restaurant.  (*See id.* ¶¶ 4, 9.)  The sewage caused substantial damage to the building Spiros operated in and permanently destroyed much of Naxos's business property.  (*Id.* ¶ 6; Gaouette Decl. (Dkt. # 62) ¶¶ 7-8.)  Over the next two weeks, a remediation company pumped over 600 gallons of black water sewage out of the restaurant.  (Loukas Decl. ¶¶ 7-8.)

**B.    Naxos's Insurance Application and Insurance Policy**

At some point in 2013, prior to the sewage spill, a Naxos representative, Trina Loukas, met with insurance agents for AFI, Jean Lee and Johnny Lim, to discuss the possibility of Naxos opening a policy with AFI.  (*See* Lim Decl. (Dkt. # 58) ¶ 2; 12/5/19 Muth Decl. (Dkt. # 57) ¶ 3, Ex. 2 ("Trina Loukas 30(b)(6) Dep.") at 68:5-69:4).)  Mr. Lim testified that Trina Loukas told him that she was the "owner" of Spiros and was "responsible for running" the restaurant.  (*See* Lim Decl. ¶ 4.)  Mr. Lim also claims that Trina Loukas represented that "Naxos[,] LLC was the owner of the building located [at] 215 1st Ave. S., Kent, WA 98032," which was the location of Spiros (the "Property").  (*See id.* ¶ 3.)  In two different depositions taken in this case, however, Trina Loukas testified that her mother-in-law, Asimo Loukas, was the sole owner of Naxos, LLC and the Property.  (*See* Trina Loukas 30(b)(6) Dep. at 19:19-22:11; 12/5/19 Muth Decl. ¶ 2, Ex. 1 ("Trina Loukas Dep.") at 36:13-15.)  Although both parties now agree that Asimo Loukas owned the Property at the time that Naxos applied for insurance with AFI (*see*

//

Def. MSJ at 3; Pl. Resp. at 4-6), AFI claims that Naxos represented that it owned the Property during the application process (*see* Def. MSJ at 3-4).[2]

AFI ultimately issued a Businessowners Policy (the "Policy") to Naxos on November 1, 2013. (*See* Loukas Decl. ¶ 10, Ex. 1 ("Policy"); Comstock Decl. (Dkt. # 68) ¶ 2, Ex. 6 ("Cert. of Ins.") at Lim Production 000281 (listing a November 1, 2013, effective date for the Policy).) The Declarations page lists Naxos as the sole named insured, uses the address of the Property as the "location" of the insured premises, and states that the Property is "Owner Occupied." (*See* Policy at NAXOS-AMFAM00186.) In relevant part, the Policy provides coverage for the Property; Naxos's "business personal property;" lost business income; water damage, including damage caused by sewage back up or sump overflow; and debris removal. (*See id.* at NAXOS-AMFAM00194-98, 233.) The Policy's "limit of insurance" is $787,245.00 for building coverage, $270,300.00 for business personal property, $5,000.00 for sewer backup and sump overflow, and "actual loss sustained" for lost business income. (*See id.* at NAXOS-AMFAM00186-87.)

On August 5, 2015, shortly after Naxos identified the sewage spill, Naxos notified AFI about the spill at Spiros and opened a claim for the loss. (*See* 12/5/19 Muth Decl.

---

[2] AFI claims that Naxos submitted a written application for insurance to AFI (*see* 12/5/19 Muth Decl. ¶ 12, Ex. K ("Daigle 30(b)(6) Dep.") at 117:3-10; Def. MSJ at 21 ("When Naxos filled out their insurance policy information, they represented that they were the owners of the building at 215 1st Ave South in Kent, Washington."), but AFI did not submit a copy of a written insurance application from Naxos in support of its motion. Naxos represents that the only insurance application AFI produced in discovery was unsigned, undated, and not appended to Naxos's insurance policy, thus making the application inadmissible under Washington law. (*See* Pl. Cross Mot. at 4 n.2.)

¶ 12, Ex. K ("Daigle 30(b)(6) Dep.") at 10:19-11:10; Loukas Decl. ¶ 5; Neal Decl. (Dkt. # 65) ¶ 3, Ex. 2 ("Claims File") at 171-72.[3]

## C. AFI's Initial Investigation

On August 7, 2015, at Naxos's direction, a plumber and a water damage remediation company, 1-800 Water Damage, visited the Property to inspect the damage. (*See* Claims File at 170-71; Loukas Decl. ¶ 7.) On August 10, 2015, AFI's adjuster, Erik Boe, completed an inspection of the Property. (*See* Claims File at 170-71; Daigle 30(b)(6) Dep. at 164:9-21.) Sometime after Mr. Boe's inspection, AFI hired a remediation contractor, Servpro Restoration Services, to inspect the loss and review 1-800 Water Damage's proposed scope of work. (*See* Claims File at 169.) Servpro agreed with 1-800 Water Damage's scope of repair. (*See id.* at 168-69; Neal Decl. ¶ 6, Ex. 5 ("Boe Dep.") at 74:17-19.) Servpro informed AFI that there was contaminated sewage water seeping through the flooring and drywall at Spiros, a "heavy infestation of flies," and "maggots in the crawlspace." (*See* Claims File at 169; Daigle 30(b)(6) Dep. at 190:24-191:19.)

1-800 Water Damage emailed a preliminary estimate for the repair to AFI on August 31, 2015, that estimated it would cost between $85,000-100,000 to remediate the water damage to the Property. (*See* Claims File at 167-68.) In response, AFI informed Naxos that it would hire an independent adjuster to review the loss on September 4, 2015, due to concerns about 1-800 Water Damage's responsiveness to AFI's questions about

---

[3] Because Exhibit 2 to the Neal Declaration contains non-consecutive bates-numbered pages, the court cites the page numbers supplied by its electronic docketing system.

the initial estimate. (*See id*.) On September 11, 2015, the independent adjuster¸ Tim

Hanley, informed AFI that a small leak that "may have been going on for a long period of

time" could have contributed to the sewage spill. (*See id.* at 167.) Due to AFI's concerns

about the "sizeable loss potential" and the importance of "get[ting] clear on coverage,"

AFI decided to hire an engineer, Scott Thomas, to "determine the cause and time" of the

loss on September 11, 2015. (*See id.*) That same day, AFI issued a reservation of rights

letter to Naxos that indicated that "there is a question whether coverage under the policy

. . . will apply to this loss." (*See id.* at 189.) AFI also informed Naxos that AFI "must

conduct a complete investigation of the circumstances of the claim before determining

whether your policy provides coverage for this claim." (*See id.*)

On September 14, 2015, Mr. Thomas emailed Gayle Anderson, who was assisting

Naxos with its insurance claim, to request documents and other preliminary information

to assist with his investigation. (*See id.*; Comstock Decl. ¶ 2, Ex. 12 ("Once this

catastrophe started on 8/6/15, we hired Gayle Anderson to be the manager to deal with

everything regarding Asimo's building and Spiros Greek Island.").) On September 24,

2015, Mr. Thomas met with Ms. Anderson at the Property to inspect the loss. (*See*

Claims File at 165-66.) Although Mr. Thomas reported that he could not "provide a solid

opinion at this time," he informed AFI that he suspected that the sewage spill may have

resulted from a long-term leak. (*See id.* at 165.)

On September 15, 2015, Naxos expressed concern to AFI about the delay in the

adjustment of the loss and informed AFI that it was considering hiring an attorney. (*See*

*id.* at 166.) Ms. Anderson contacted AFI again on September 30, 2015, and asked AFI

what additional information it needed to make a coverage determination.  (*See id.* at 163.)
AFI informed Ms. Anderson that it needed more information about the plumber who
inspected the sewage spill shortly after it occurred.  (*See id.*)  On October 1, 2015,
however, AFI decided to "go ahead and proceed with processing this claim" because AFI
was aware that "the plumbing was the issue."  (*See id.* at 162.)  AFI also stopped using
Mr. Thomas to investigate the cause of the loss, but determined that it would get its own
repair estimate in order to audit the estimate provided by 1-800 Water Damage.  (*See id.*)
That same day, AFI contacted Ms. Anderson and informed her that AFI would process
the claim and include coverage for loss of business income and damage related to
"water/sewage discharge."  (*See id.* at 161-62.)

**D.      AFI's Payments for Lost Business Income and Payroll Expenses**

Under the Policy, Naxos was entitled to coverage for "loss of Business Income"
for 12 months following the loss and for "ordinary payroll expenses" for 60 days
following the loss.  (*See* Policy at AMFAM-NAXOS00197.)  The Policy defines
"Business Income" as net income that would have been earned if the loss had not
occurred and "continuing normal operating expenses incurred, including payroll."  (*See
id.* at AMFAM-NAXOS00197-98.)  The Policy defines "ordinary payroll expenses" as
payroll expenses for all employees except officers, executives, department managers, and
employees under contract.  (*See id.* at AMFAM-NAXOS00198.)

//

//

//

AFI began issuing payments to Naxos to cover Naxos's lost business income and payroll in October 2015.[4] (*See* Transaction History at 108-110; Claims File at 150-161.) On October 2, 2015, AFI sent Naxos $19,905.00 to cover Naxos's lost business income for August 2015.[5] (*See* Transaction History at 110; Claims File at 158-160.) On October 7, 2015, AFI sent Naxos two payments: (1) a $16,957.08 payment for Naxos's lost business income from September 2015, and (2) a $5,540.00 payment for Naxos's September 2015 employee payroll. (*See* Transaction History at 109; Claims File at 154-157.) On October 16, 2015, AFI submitted an additional $4,500.00 payment to Naxos for September 2015 payroll. (*See* Claims File at 152; Transaction History at 109.) Thus, in total, AFI paid Naxos $16,957.08 for September 2015 lost business income and $10,040.00 for September 2015 payroll expenses.

Of the $10,040.00 that AFI paid for Naxos's September 2015 payroll, $7,800.00 went to members of the Loukas family. John and William Loukas are Asimo Loukas's sons. (*See* 12/5/19 Muth Decl. ¶ 4, Ex. C ("William Loukas Dep.") at 17:14-20; 12/5/19 Muth Decl. ¶ 10, Ex. J ("John Loukas Dep.") at 72:3-4.) William Loukas is also Trina Loukas's husband. (William Loukas Dep. at 12:8-16.) Ms. Anderson is Trina Loukas's mother. (Trina Loukas Dep. at 26:6-9.) According to AFI's records, Naxos initially

---

[4] Although AFI did not begin fully reimbursing Naxos for its alleged lost business income until October 2015, AFI issued an advance of $5,000.00 to Naxos for Naxos's lost business income on August 20, 2015. (*See* 8/22/19 Muth Decl. (Dkt. # 32) ¶ 10, Ex. I ("Transaction History") at 108-110; Claims File at 150-161, 169.)

[5] The record does not specify how the payment for the month of August 2015 was allocated or whether the payment included coverage for "ordinary payroll expenses."

submitted "payroll records" to AFI that indicated that that Naxos owed payments to three individuals: Ms. Anderson, who was owed $1,500.00; William Loukas, who was owed $1,800.00; and Mario Alcala, who was owed $2,240.00. (*See* Claims File at 155.) AFI sent the second payment for an additional $4,500.00 because Ms. Anderson informed AFI that she was paid $1,500.00 twice a month and that Naxos also owed a fourth individual, John Loukas, a $3,000.00 payment for September 2015. (*See id.* at 154.) Thus, AFI concluded that it owed Naxos $10,040.00 for September 2015 payroll to cover the following payments: $3,000.00 for Ms. Anderson, $1,800.00 for William Loukas, $2,240.00 for Mario Alcala, and $3,000.00 for John Loukas. (*See id.* at 152.) The "payroll documents" that Naxos allegedly submitted in support of its payroll claims are not in the record. Instead, the only evidence regarding these payments before the court is in AFI's claims log. (*See* Claims File at 152-155.)

The evidence in the record regarding William Loukas's role at Naxos is contradictory. William Loukas testified that he cooked at Spiros and assisted with inventory from approximately 2003 to 2008 and then left the restaurant for a period of time before returning in 2011 and 2012 to assist with inventory control. (*See* William Loukas Dep. at 34:8-36:7.) William Loukas claimed that he has not "done anything" for Naxos since 2012 (*see id.* at 36:8-14), but Naxos submitted payroll records from July 2014 to July 2015 showing that Naxos paid William Loukas approximately $2,000.00 a month during that time period. (Comstock Decl. ¶ 2, Ex. 10 at 31-37.) William Loukas also testified that he assisted Naxos with its bankruptcy proceedings, which took place in 2014 and 2015, and Naxos's bankruptcy filings indicate that he was a "manager" of

Naxos's business operations during the bankruptcy process and that he was drawing a $2,000.00 monthly salary for his services as a manager. (*See* William Loukas Dep. at 47:10-48:6, 53:5-56:12; 8/22/19 Muth Decl. ¶ 3, Ex. B at 19, 28.) Although AFI's records indicate that Naxos claimed that William Loukas was entitled to payroll disbursements in September 2015 (*see* Claims File at 152-155), William Loukas was in jail at the time of the sewage spill and was not released until October or November of 2015 (*see* William Loukas Dep. at 10:9-11:11, 36:22-37:23). However, Naxos kept William Loukas informed of the status of the sewage spill during his incarceration, and he claimed that he visited Spiros to inspect the loss once he was released. (*See id.* at 37:2-38:8, 40:25-41:3.) However, he also testified that he did not otherwise assist Naxos in remedying the loss because there "wasn't really anything for [him] to do." (*See id.* at 37:24-38:8, 40:25-41:3.)

John Loukas testified that he has been employed as a cook at Romeo's Pizza since 2004. (*See* John Loukas Dep. at 13:21-16:20.) Romeo's Pizza was also owned by the Loukas family until the Loukas's sold it in 2018. (*See id.*) Although John Loukas claims that he was never officially employed or paid by Spiros, he testified that he would visit the restaurant occasionally to help train staff and perform maintenance as a favor to his mother. (*See id.* at 16:21-18:5, 19:19-20:6.) Naxos informed AFI's accountant that John Loukas was hired as the "contract manager" after the sewage spill. (*See* Comstock Decl. ¶ 2, Ex. 10 at 19-30.) John Loukas testified, however, that the only contractor he hired for Spiros was 1-800 Water Damage. (*See* John Loukas Dep. at 22:19-23:9, 66:16-67:9, 71:8-10.) Outside of going to the Property with Ms. Anderson to meet with 1-800 Water

1   Damage, John Loukas had no involvement with the insurance claim. (*See id.* at 68:8-14,

2   75:25-76:18, 78:10-79:1, 82:18-83:5.) He testified that Trina Loukas and Ms. Anderson

3   were principally responsible for Naxos's insurance claim. (*See id.* at 82:17-22.) John

4   Loukas also testified that he had no ability to make purchases for Spiros, did not have a

5   bank card for Spiros, did not have access to checks for Spiros, and did not do any

6   bookkeeping or banking for Spiros. (*See id.* at 61:1-15.)

7           AFI continued to send Naxos monthly payments to cover lost business income for

8   each month from October 2015 to July 2016.[6] (*See* Transaction History at 105-108.) The

9   payment amounts for those months ranged from $20,000 to $31,000. (*See id.*) Although

10  AFI paid Naxos separately for its September 2015 payroll expenses and lost business

11  income, after the September 2015 payments, AFI made monthly lump sum payments for

12  lost business income without specifically indicating what payroll expenses were included

13  as part of the monthly expenses. (*See id.*; Claims File at 121, 126-27, 139, 143, 147.)

14  Emails from AFI's accountant, Melody Ewers, to Mr. Boe indicate that the "employees

15  being paid by the business . . . include [the] Restaurant Manager, Owner, Project

16  Manager, Contract Manager, and a [c]ook." (*See* Comstock Decl. ¶ 2, Ex. 10 at 12-20.)

17  These emails indicate that John Loukas is the "Contract Manager" and Ms. Anderson is

18  the "Project Manager" that Ms. Ewers referred to. (*See id.* at 19.) It is not clear from the

19  record who Ms. Ewers was referring to as the Restaurant Manager, Owner, or cook at

20

21  _____

    [6] Naxos's lost business income coverage under the Policy expired after one year of
payments. Thus, AFI paid Naxos for lost business income and payroll expenses from August 5,
22  2015, to August 4, 2016. (*See* Claims File at 98, 101-04.)

Naxos; how much Naxos was paying those individuals; whether AFI's monthly payments for lost business income covered amounts paid to those individuals; or what documentation or representations from Naxos Ms. Ewers relied on to reach her conclusions.

In total, for the time period from August 5, 2015, to August 4, 2016, AFI paid Naxos $304,519.95 for lost business income and payroll expenses. (*See* Transaction History at 105-110; Claims File at 101-04.)

**E.     Property Damage Disputes**

1.     <u>1-800 Water Damage's Remediation Efforts</u>

On October 1, 2015—when AFI first informed Naxos that it would provide coverage for the sewage spill—AFI informed Ms. Anderson that AFI had hired a contractor, Belfor USA, to provide a competing bid for the mitigation and repair of the damage due to the lack of specificity in 1-800 Water Damage's estimate. (*See* Claims File at 161-62.) Belfor USA performed its inspection on October 2, 2015. (*See id.* at 158.) Three weeks later, on October 22, 2015, AFI received a preliminary estimate from Belfor USA and Mr. Hanley that estimated that the actual cash value of repairs to the Property plus sewage pumping costs would be $43,732.48. (*See id.* at 151-52.) This estimate did not include costs to replace business and personal property that was damaged during the sewage spill. (*See id.*) Pursuant to the estimate provided by Belfor USA and Mr. Hanley, AFI issued a $43,732.48 payment to Naxos for repairs and sewage pumping on October 22, 2015. (*See id.*; Transaction History at 109.)

//

After AFI paid Naxos $43,732.48, repairs on the Property stalled. (*See* Trina

Loukas Dep. at 126:24-128:8; Trina Loukas 30(b)(6) Dep. at 114:22-116:1; William

Loukas Dep. at 36:5-40:12.) Multiple Naxos representatives testify that 1-800 Water

Damage "disappeared" at some point after October 2015 without fully remediating the

damage. (Trina Loukas 30(b)(6) Dep. at 115:10-117:8; William Loukas Dep. at

36:5-40:12; 12/5/19 Muth Decl. ¶ 5, Ex. D ("Gaouette Dep.") at 16:6-20:17; Gaouette

Decl. ¶ 11; 12/5/19 Muth Decl. ¶ 6, Ex. E ("Anderson Dep.") at 30:21-23.) On

December 18, 2015, AFI received a mitigation invoice from 1-800 Water Damage for

work completed on the property. (*See* Claims File at 146.) AFI informed 1-800 Water

Damage that AFI had already issued a $43,732.48 payment to Naxos and that and a

number of items in 1-800 Water Damage's invoice appeared to be excessive or

duplicative of the amounts AFI had already paid. (*See id.*) On December 31, 2015, AFI

spoke with Ms. Anderson to discuss the challenges AFI was having with 1-800 Water

Damage's invoice and with its delay in completing its portion of the project. (*See id.* at

144.) Ms. Anderson informed AFI that Naxos was also frustrated with 1-800 Water

Damage's lack of progress and that Naxos was considering hiring a different contractor

to complete the repairs. (*See id.*) On January 4, 2016, 1-800 Water Damage contacted

AFI to discuss the ongoing invoice and payment issues. (*See id.* at 143.) That same day,

Ms. Anderson called AFI and informed AFI that Naxos wanted to hire a different

contractor because 1-800 Water Damage indicated it would be unable to complete the

project. (*See id.*)

//

## 2. Post 1-800 Water Damage Property Damage Payments

By February 1, 2016, Naxos hired Armata Construction to take over remediation and repair work from 1-800 Water Damage. (Loukas Decl. ¶ 11.) Naxos also hired a public adjuster, Dudley Gaouette, to assist with its claim in February or March 2016. (*See* Gaouette Dep. at 10:16-11:3; Gaouette Decl. ¶¶ 3-4, 11.) Mr. Gaouette testified that when he first visited the Property in February or March 2016, he could still smell mold, Naxos's business personal property remained on site, and he noticed a significant number of dead insects and fruit flies. (Gaouette Dep. at 10:16-11:3, 22:22-24:15, 25:23-26:5; Gaouette Decl. ¶ 11.) At that time, AFI, Naxos, and 1-800 Water Damage had not hired an industrial hygienist to inspect the Property or develop a plan to remediate the property. (*See* Gaouette Dep. at 23:24-24:15, 26:25-27:15; Gaouette Decl. ¶¶ 14, 16.)

After Mr. Gaouette visited the site, he concluded that a significant amount of remediation work still needed to be conducted on the Property. (*See* Gaouette Dep. at 35:22-39:7; Gaouette Decl. ¶ 11.) In addition to the remediation work to the Property itself, Mr. Gaouette believed that Naxos needed to remove, clean, and store all the business personal property that remained at the Property.[7] (*See* Gaouette Dep. at 39:8-19.) Mr. Gaouette hired an industrial hygienist, Susan Evans, to assist with remediation, and a company called Superior-COIT to assist with Naxos's remaining business personal property. (*See* Gaouette Dep. at 38:11-39:19; Gaouette Decl. ¶ 13.) By

---

[7] Ms. Anderson had previously hired Complete Restaurant Repair to store and clean Naxos's business personal property, but Mr. Gaouette testifies that Complete Restaurant Repair did not remove all of Naxos's business personal property from the Property. (*See* Gaouette Dep. at 39:20-42:3.)

April 5, 2016, Ms. Evans had submitted a detailed report and remediation work plan for Spiros that she later revised in January 2017.  (*See* Gaouette Decl. ¶ 13, Ex. A ("Evans Rpt.").)

In April 2016, AFI hired another contractor, Madsen, Kneppers & Associates, Inc. ("MKA"), to perform two primary tasks:  (1) audit 1-800 Water Damage's work to help resolve AFI's ongoing payment disputes with 1-800 Water Damage, and (2) create an estimate for finishing the repairs that 1-800 Water Damage did not complete that AFI could use to reach an agreed price with a contractor who could perform the remaining work.  (*See* Claims File at 127-28.)  At the same time, Mr. Gaouette and Armata Construction were preparing an estimate on Naxos's behalf for repair, remediation, and business personal property pack-out and cleaning.  (*See id.* at 121-22.)

In May 2016, MKA completed its review of 1-800 Water Damage's work and concluded that "little was done" by 1-800 Water Damage to mitigate the loss.  (*See* Claims File at 117.)  MKA ultimately determined that only $30,022.98 of 1-800 Water Damage's invoice was supportable.  (*See id.*)  Accordingly, on May 27, 2016, AFI issued a $30,022.98 payment to Mr. Gaouette for purposes of resolving AFI's dispute with 1-800 Water Damage over the scope of work performed by 1-800 Water Damage.  (*See* Transaction History at 106; Claims File at 114-15.)

By June 28, 2016, AFI had received initial estimates from MKA and Mr. Gaouette for the remaining repair and mitigation work.  (*See* Claims File at 106-07.)  Mr. Gaouette initially estimated that the replacement cost value for repairs, mitigation, and business personal property was $563,973.12.  (*See id.*)  MKA initially estimated that the

replacement cost value of repairs and mitigation was $314,652.05 and the actual cash value of those work items was $278,642.76. (*See id.*) After reviewing Mr. Gaouette's estimate, MKA worked with Belfor USA to revise its initial estimate. (*See id.* at 88.) On October 20, 2016, MKA submitted another estimate that concluded that the total replacement cost value for the repairs and mitigation was $342,368.23 and the net actual cash value—which represented MKA's replacement cost value estimate less code upgrades not covered by the Policy and depreciation—was $265,882.36. (*See id.*) This estimate did not include costs associated with replacing kitchen equipment or other business personal property. (*See id.*)

Despite the discrepancy between MKA's and Mr. Gaouette's estimates, on November 4, 2016, AFI submitted a $221,149.88 payment to Naxos for repairs and mitigation. (*See* Claims File at 83-84; Transaction History at 104.) The $221,149.88 amount was based on MKA's net actual cash value estimate minus Naxos's deductible and the $43,732.48 payment AFI provided to Naxos in October 2015. (*See* Claims File at 83-84.) On March 27, 2017, Mr. Gaouette emailed AFI a revised repair and mitigation estimate that estimated that the replacement cost value of the repairs, mitigation, and business personal property damages was $624,519.48. (*See* Claims File at 72-73; Miletich Rpt. (Dkt. # 63) ¶ 4, Ex. 1; Gaouette Decl. ¶¶ 20-21, Exs. B-C.) On May 22, 2017, AFI issued a $20,701.18 supplemental payment to Naxos based on MKA's review of the revised estimate from Mr. Gaouette. (*See* Transaction History at 102; Claims File at 58-66.)

//

Beginning in December 2016, AFI began submitting payments to Naxos for its damages to business personal property. On December 7, 2016, AFI paid Naxos a $20,000 advance to cover the ongoing dispute over business personal property. (*See* Transaction History at 104; Claims File at 81-83.) On January 31, 2017, AFI concluded that the actual cash value for damage to Naxos's business personal property was $51,297.21. (*See* Claims File at 78.) Accordingly, on February 7, 2017, AFI submitted a $31,297.21 supplemental business personal property coverage payment to Naxos, which represented the total actual cash value owed minus the $20,000 advance. (*See* Claims File at 74-78; Transaction History at 103.) On April 27, 2017, AFI sent Superior-COIT a $31,540.65 payment for the business personal property pack-out, cleaning, and storage expenses. (*See* Transaction History at 103; Claims File at 66-70.)

 3. <u>Appraisal</u>

On June 7, 2017, Mr. Gaouette informed AFI that Naxos disputed AFI's coverage valuation and demanded an appraisal pursuant to the Policy. (*See* Claims File at 53-54; Policy at NAXOS-AMFAM00208.) On March 6, 2018, an appraisal panel determined that the actual cash value of Naxos's insurance claim—including business personal property, remediation, and damage to the Property—was $566,209.17.[8] (*See* Gaouette Decl. ¶ 22, Ex. D ("Appraisal Award"); Claims File at 14-16.) At the time the award was issued, AFI concluded that it had paid Naxos $399,444.38—$294,905.34 for

---

[8] Although the appraisal award states that the damage to the Property was $457,072.37 and the actual cash value of the damage to the business personal property was $109,136.80, it is not clear how the appraisal panel defined those terms. (*See* Appraisal Award.)

building-related damage and $103,539.04 for business personal property-related damages.  (*See* Claims File at 14-15.)  Thus, as a result of the appraisal, AFI concluded that it owed Naxos $166,764.79 and AFI promptly paid that amount to Naxos in three installments between March 28-30, 2018.[9]  (*See* Transaction History at 99-100; Claims File at 7-15.)  Without explaining its calculation, Naxos claims that the total amount that AFI underpaid prior to the appraisal award was $201,920.00.  (*See* Gaouette Decl. ¶ 19.)

### III.    ANALYSIS

This is not an insurance coverage dispute.  AFI does not dispute coverage (*see* Def. Resp. at 20 ("Coverage was accepted by [AFI] from the outset and was never pulled.")), and Naxos does not seek additional insurance benefits (*see* Pl. MSJ at 10 ("Naxos is not, by this action, seeking further or additional insurance benefits.")).  Instead, this action centers on (1) Naxos's conduct in applying for insurance and pursuing its insurance claim, and (2) the adequacy of AFI's response to Naxos's claim.  Naxos claims that AFI's failure to properly investigate and adjust Naxos's loss constitutes a breach of the Policy, insurance bad faith, negligent claims handling, a violation of Washington's Consumer Protection Act ("CPA"), and a violation of Washington's Insurance Fair Conduct Act ("IFCA").  (*See* Pl. MSJ at 9-10; Compl. ¶¶ 4.1-8.5.)  Naxos's seeks partial summary judgment on AFI's liability for each of those claims

//

---

[9] AFI sent one of the installments to the federal government and another one to the state of Washington due to Naxos's outstanding tax liens. (*See* Transaction History at 99-100; Claims File at 7-16.)

except its breach of contract claim.[10]  (*See* Pl. MSJ at 1-2, 21.)  AFI moves for summary judgment on the grounds that Washington law bars Naxos from obtaining the relief it seeks because Naxos made material misrepresentations both in its application for insurance and during the insurance claim process.  (*See* Def. MSJ at 1-2.)  Finally, Naxos cross-moves for summary judgment on AFI's affirmative defenses and counterclaims based on misrepresentation.  (*See* Pl. Cross Mot. at 1-2.)  The court sets forth the summary judgment standard before addressing each motion in turn.

**A.  Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  To satisfy its burden at summary judgment, a moving party with the burden of persuasion "must establish beyond controversy every essential element of its . . . claim."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks and citation omitted).  By contrast, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party

_____

[10] Naxos's statement of issues indicates that it also seeks summary judgment on its claim for breach of the Policy.  (*See* Pl. MSJ at 9.)  However, Naxos offers no argument on that issue, and Naxos's introduction and conclusion, which set forth the relief Naxos seeks, does not ask the court to find as a matter of law that AFI breached the Policy.  (*See id.* at 1-2, 20.)  Thus, the court concludes that Naxos has not raised a motion for summary judgment on its claim for breach of the Policy and does not consider that issue.

does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citing *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990)).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)). The court "rule[s] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)

(“We evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.”) (citations and internal quotation marks omitted).

**B.  AFI's Motion for Summary Judgment**

      1.    <u>Misrepresentation in Insurance Application</u>

      AFI argues that Naxos misrepresented its ownership interest in the Property during its insurance application process with AFI.  (*See* Def. MSJ at 14-17.)  It has long been settled under Washington law that an insurer's liability under an insurance policy may be avoided where "untrue representations were knowingly made in the application for the policy and that, in making those representations, the applicant had an intent to deceive the company." *Kay v. Occidental Life Ins. Co.*, 183 P.2d 181, 182 (Wash. 1947) (citations omitted); *Ki Sin Kim v. Allstate Ins. Co.*, 223 P.3d 1180, 1189 (Wash. Ct. App. 2009) ("In order to avoid liability based on a material misrepresentation, the insurance company must demonstrate that the insured knowingly made the untrue representations and that, in making those representations, the applicant intended to deceive the company.") (citing *Kay*, 183 P.2d at 182).  Washington codified this rule in RCW 48.18.090(1), which states:

> [N]o oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his or her behalf, shall be deemed material or defeat or avoid the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.

RCW 48.18.090(1).  Misrepresentation must be proven by "clear, cogent, and convincing evidence," which requires "that the trier of fact be convinced that the fact in issue is 'highly probable.'" *Queen City Farms v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703,

//

728 (Wash. 1994) (citations omitted).[11]  Moreover, because misrepresentation is an

affirmative defense, AFI bears the burden of proof.[12]  *See id.*

AFI fails to carry its burden to show that there is no genuine dispute of material

fact on its argument that Naxos materially misrepresented its ownership in the Property in

its insurance application.  First, there is a question of fact regarding whether Trina

Loukas ever represented that Naxos owned the Property in the first place.  AFI is correct,

of course, that the Declarations page of the Policy states that the Property is "owner

occupied."  (*See* Policy at NAXOS-AMFAM00186.)  But that ambiguous statement,

---

[11] The portion of Justice Brachtenbach's majority opinion in *Queen City Farms* dedicated to material misrepresentations is not the Court's majority opinion on that issue.  *See* 882 P.2d at 728-32.  Instead, Justice Utter's dissenting opinion is the majority opinion on material misrepresentation.  *See id.* at 733-36 (Utter, J., dissenting), 733 (Anderson, J., concurring in part, dissenting in part) (joining Justice Utter's opinion on material misrepresentation), 738 (Guy, J., dissenting) (joining Justice Utter's opinion on material misrepresentation in an opinion joined by Justices Durham and Madsen).  But the divide between Justice Utter and Justice Brachtenbach was not based on the blackletter law on material misrepresentations.  *Compare id.* at 728-32 *with id.* at 733-36.  Instead, the Justices disputed the appropriate application of the clear, cogent, and convincing evidence standard to the facts of that case.  *See id.* (Utter, J., dissenting) ("I disagree with the majority's conclusion the trial court improperly denied a motion for a judgment n.o.v. with respect to the Lloyd's of London policy.  Because evidence was presented from which the jury reasonably could have inferred a material misrepresentation was made, we should respect the jury's finding of fact on this issue.").  Thus, the court concludes that the material misrepresentation standard announced in *Queen City Farms* is good law and adopts it here.  *See Karpenski v. Am. Gen. Life Companies, LLC*, 999 F. Supp. 2d 1235, 1248 (W.D. Wash. 2014) (citing *Queen City Farms* in support of the standard for material misrepresentations).

[12] The court rejects the parties' arguments that AFI must prove all nine elements of fraud to establish a misrepresentation in the insurance application.  (*See* Def. MSJ at 15; Pl. Cross Mot. at 12.)  The case the parties cite in support of that argument does not state that an insurer must prove all nine elements of fraud to establish misrepresentation in an insurance application.  *See St. Paul Mercury Ins. Co. v. Salovich*, 705 P.2d 812, 814 (Wash. Ct. App. 1985).  To the contrary, that case cites the standard set forth in *Kay* that the court cited above.  *See id.* ("The cases pertaining to claimed misrepresentations in the application for insurance generally hold that liability of an insurance company cannot be avoided on the grounds of misrepresentation unless it appears that false statements were knowingly made in the application for the policy and that, in making them, the applicant had an intent to deceive the company.").

without more, does not prove that Naxos misrepresented its ownership in the Property during the application process by clear, cogent, and convincing evidence. Although it is true that Naxos, not Asimo Loukas, occupied the Property, Asimo Loukas was the sole owner of the Property and Naxos. (*See* Trina Loukas 30(b)(6) Dep. at 19:19-22:11; Trina Loukas Dep. at 36:13-15; Comstock Decl. ¶ 2, Ex. 7.) Thus, viewed in the light most favorable to Naxos, a jury could reasonably conclude that the building was "owner occupied," because, as Trina Loukas testified, "Naxos [was] Asimo" and "Asimo [was] Naxos." (*See* Trina Loukas 30(b)(6) Dep. at 21:21-22:11.)

Further, the fact that AFI has not submitted a written copy of the application as evidence—apparently because there is no admissible copy of a written application (*see* Pl. Cross Mot. at 4 n.1)—hampers the court's ability to determine as a matter of law that Naxos misrepresented its ownership in the Property. Because of the lack of written evidence, the only direct evidence before the court regarding Naxos's representations to AFI during the application process are the recollections of Trina Loukas and Mr. Lim. Although Mr. Lim's declaration states that Trina Loukas represented to him that "Naxos[,] LLC was the owner of the building located [at] 215 1st Ave. S., Kent, WA 98032" (*see* Lim Decl. ¶ 3), Mr. Lim's deposition testimony is contradictory on this point. Mr. Lim first testified that he could not remember the specific questions that he asked Ms. Loukas at his meeting with her and that he has only a general recollection of the topics they discussed (Lim Dep. at 34:18-35:13, 38:1-16; 40:1-22), but when Naxos's counsel presented him with his declaration, he testified that he remembered exactly what Trina Loukas said to him about Naxos's ownership of the Property (*see id.* at 86:4-22).

Trina Loukas testified that she cannot recall exactly what she spoke about with Mr. Lim, but that she recalls that portions of the application were already filled out by AFI by the time she met with Mr. Lim. (Trina Loukas 30(b)(6) Dep. at 69:2-70:4.) This suggests that AFI may have concluded that Naxos owned the building without discussing that point with Trina Loukas. The court will not resolve this credibility dispute on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). Instead, the court concludes that AFI's motion for summary judgment on Naxos's alleged misrepresentation in the insurance application must be denied because there is a genuine dispute of material fact regarding whether Naxos misrepresented ownership of the Property during the application process.[13]

Although the genuine dispute of material fact on the existence of a misrepresentation is enough to deny AFI's motion, the court also concludes that AFI has not carried its burden to establish that any representation by Naxos was material or made with the intent to deceive. A representation made in conjunction with an insurance policy application is material if the representation influenced the insurance company's decision to issue the policy. *See Queen City Farms*, 882 P.2d at 730. "The materiality of a

---

[13] The court rejects Naxos's request to discover communications between Mr. Lim and AFI's counsel as improper and untimely. (*See* Pl. Cross Mot. at 14 n.5.) If Naxos felt it was entitled to discover these communications, it should have followed the court's procedures for raising discovery motions within the parameters of the court's case schedule. (*See* Sched. Order at 1-2.)

misrepresentation is usually a question of fact." *Cutter & Buck, Inc. v. Genesis Ins. Co.*, 306 F. Supp. 2d 988, 1003 (W.D. Wash. 2004) (citing *Olson v. Bankers Life Ins. Co.*, 63 Wash.2d 547, 552, 388 P.2d 136 (1964)).  AFI submitted a declaration from an underwriter, Tou Vang, that states that if AFI had known that Naxos did not own the Property, AFI would not have issued the Policy to Naxos because it would not have been proper under AFI's underwriting guidelines to do so.  (*See* Vang Decl. (Dkt. # 59) ¶ 6.) Mr. Lim's declaration also states that he relied on Trina Loukas's representation that Naxos owned the Property in "mov[ing] forward" with Naxos's application and that AFI would not have included the Property in the Policy had AFI known that Naxos did not own the Property.  (*See* Lim Decl. ¶¶ 5-7.)  Dustin Daigle—one of AFI's 30(b)(6) witnesses who works as AFI's policies and procedures manager for "commercial farm/ranch," which oversaw Naxos's claim (*see* Daigle 30(b)(6) Dep. at 16:25-17:21)— testified that AFI may have written Naxos's policy differently had AFI known that Naxos was only a tenant and not the owner (*see id.* at 120:9-121:24).

This evidence is not enough to conclude that AFI has established materiality as a matter of law.  Neither Mr. Daigle nor Mr. Lim are underwriters (*see* Lim Decl. ¶ 1; Daigle 30(b)(6) Dep. at 16:25-17:21), which limits their ability to opine on whether AFI would have covered the building had Naxos acknowledged that it did not own the building, as Mr. Daigle acknowledged (*see* Daigle 30(b)(6) Dep. at 120:20-121:1). Although Mr. Vang is an underwriter familiar with AFI's underwriting guidelines (*see* Vang Decl. ¶¶ 2-4), Mr. Vang's declaration is conclusory and light on evidentiary facts. (*See generally* Vang Decl.)  He does not address, for example, the fact that the sole

owner of Naxos is also the sole owner of the Property and whether that would have any impact on his conclusions. (*See generally id.*) Mr. Vang also acknowledged that he did not underwrite Naxos's policy or speak with the underwriter who was responsible for making the decisions for AFI on Naxos's application. (Comstock Decl. ¶ 2, Ex. 16 ("Vang Dep.") at 17:12-19:9.) As such, his personal knowledge of Naxos's application is limited.

Moreover, there is a genuine dispute of material fact regarding AFI's knowledge of the ownership of the Property based of the Certificate of Insurance that AFI issued in February 2014. (*See generally* Cert. of Ins.) The Certificate of Insurance, which AFI sent to Bayview Loan Servicing, LLC, lists Asimo Loukas as an "Insured." (*See id.* at Lim Production 000281-82.) A January 3, 2014, email from Mr. Lim states that "we have the corrected name for the owner of the loan (Asimo Loukas)." (*See id.* at Lim Production 000326.) Viewed in the light most favorable to Naxos, this suggests that Mr. Lim was aware that Asimo Loukas, not Naxos, owned the loan on the Property. If AFI knew that Asimo Loukas owned the loan on the Property but continued to insure Naxos, that cuts against AFI's testimony that the ownership of the Property was material. Thus, in light of these holes in AFI's testimony and the fact that Washington law holds that materiality is typically a jury question, *see Or. Nat. Life Ins. Co. v. Superior Sch. Photo Serv., Inc.*, 462 F.2d 1235, 1237 (9th Cir. 1972), the court concludes that AFI has not established materiality as a matter of law.

Finally, even if AFI had shown that Naxos misrepresented its ownership in the Property, Naxos's intent in making that misstatement would still constitute a genuine

dispute of material fact. "When a false statement has been made knowingly, there is a presumption that it was made with intent to deceive." *Cutter & Buck, Inc.*, 306 F. Supp. 2d at 1004 (citations omitted). "In the absence of credible evidence that false representations were made *without* an intent to deceive, the presumption prevails." *Id.* (citations omitted). AFI argues that this evidentiary presumption applies because Naxos knowingly misstated its ownership interest in the Property. (*See* Def. MSJ at 16.) But AFI does not cite any evidence in support of this conclusion. (*See id.*) Instead, AFI merely claims that Naxos knew that Asimo Loukas owned the Property but told AFI that Naxos owned the Property, which is a knowing misrepresentation. (*See id.*) But the evidence regarding Trina Loukas's knowledge of the ownership of Naxos is not as clear as AFI makes it out to be. During Trina Loukas's deposition, for example, she testified that she did not see a significant difference between Asimo Loukas and Naxos because "Naxos [was] Asimo" and "Asimo [was] Naxos." (*See* Trina Loukas 30(b)(6) Dep. at 21:21-22:11.) Based on that testimony, the trier of fact could conclude that any misrepresentation made Trina Loukas was inadvertent and unintentional. Thus, given that "[u]nder Washington law, the question [of] whether an insured intended to deceive his or her insurer is ordinarily one for the jury," *Superior Sch. Photo Serv., Inc.*, 462 F.2d at 1236, the court concludes that AFI has not carried its burden to establish the lack of a genuine dispute of material fact on the issue of Naxos's intent.

//

//

//

2.    <u>Misrepresentations in the Insurance Claim</u>

AFI also argues that Naxos made misrepresentations in its insurance claim that preclude Naxos from obtaining relief in this case.  (*See* Def. MSJ at 4-10, 19-20.)  Unlike AFI's affirmative defense of misrepresentation in the insurance application, which is governed by statue and caselaw, *see supra* § III.B.1, AFI's argument that Naxos made misrepresentations in its insurance claim is governed by the Policy, which provides:

C.  Concealment, Misrepresentation Or Fraud

This policy is void in any case of fraud by you as it relates to this policy at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this policy.

(Policy at NAXOS-AMFAM00227.)  "Under Washington law, a clause voiding an insurance policy for the insured's material misstatement is enforceable."  *United Specialty Ins. Co. v. Shot Shakers, Inc.*, No. C18-0596JLR, 2019 WL 199645, at *13 (W.D. Wash. Jan. 15, 2019) (citing *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1341 (W.D. Wash. 1994); *Mut. of Enumclaw Ins. Co. v. Cox*, 757 P.2d 499, 502 (Wash. 1988)).  These clauses are enforced "regardless of whether the misstatements caused any prejudice to the insurance company by causing it to bear the risk of additional risk."  *Onyon*, 859 F. Supp. at 1341 (citing *Cox*, 757 P.2d at 502).  In order to void the Policy under this provision, AFI must prove that Naxos's misrepresentations were material and

made with the intent to deceive. *See Ki Sin Kim*, 223 P.3d at 1188-89. As a general rule, "[t]he key question is whether the misstatement was material." *Onyon*, 859 F. Supp. at 1341. Where an insurer brings a claim for misrepresentation based on a misrepresentation clause, the standard of proof is preponderance of the evidence. *See St. Paul Mercury Ins. Co.*, 705 P.2d at 815.

AFI's claim for misrepresentation in the insurance claim is based on the following alleged misrepresentations: (1) Naxos misrepresented the value of its business income loss and business personal property; (2) Naxos misrepresented its employee payroll; (3) Naxos concealed or misrepresented facts about its prior knowledge of sewage violations and the nature of the sewage damage; (4) Naxos misrepresented the members of Naxos, LLC; and (5) Naxos continued to misrepresent its ownership interest in the Property.[14] (Def. MSJ at 4-10, 19-20.) The court considers each of these alleged misrepresentations in turn.

a.      *Value of Naxos's Insurance Claim*

AFI's alleges that Naxos misrepresented the value of its insurance claim. (*See* Def. MSJ at 4-6.) AFI supports this allegation with two arguments: (1) Naxos's 2014 bankruptcy filings show that AFI misrepresented the value of its business personal property in its insurance claim, and (2) Mr. Gaouette, Naxos's 30(b)(6) witness on

---

[14] AFI alleges that Naxos representatives made misrepresentations about their involvement in Urban Pizza, another restaurant that the Loukas family is connected to. (*See* Def. MSJ at 12-13.) AFI does not allege that the Loukas family's connection to Urban Pizza has any connection to its insurance claim with AFI. (*See id.*) Thus, the court concludes that AFI's arguments about misrepresentations Naxos made related to Urban Pizza are irrelevant to AFI's motion for summary judgment.

damages, testified that Naxos was claiming damages in this case that had already been

paid as part of the appraisal award or were actually not owed to third parties. (*See id.*)

The court concludes that neither argument is sufficient.

In 2014 bankruptcy filings, Naxos claimed that the value of its business personal

property was only $6,300. (*See* 8/22/19 Muth Decl. ¶ 4, Ex. C at 46.) The parties'

briefing fails to define business personal property, detail the positions the parties

advanced in front of the appraisal panel on the value of the damage to Naxos's business

personal property, or agree on the amount of coverage that the appraisal panel awarded

for business personal property.[15] (*See* Def. MSJ at 4-6; Pl. Cross Mot. at 6-7.) It is

undisputed, however, that Naxos was awarded substantially more than $6,300.00 for

damage to its business personal property and has received payments from AFI well in

excess of that amount. (*See* Transaction History at 99-100; Claims File 7-15.) AFI

argues that Naxos's low valuation in the bankruptcy filings shows that Naxos

misrepresented the value of its business personal property in its insurance claim due to

the discrepancy between the two valuations.[16] (*See id.* at 5-6 ("The $254,709.89

---

[15] AFI claims that Naxos valued its business personal property at $261,009.89 based on math that the court cannot follow. (*See* Def. MSJ at 4.) AFI cites an allegation in Naxos's complaint where Naxos claims that AFI has underpaid on the appraisal award by $201,920.00 and then somehow concludes that that means that Naxos valued its business personal property at $261,009.89 in the insurance claim. (*See id.*) Naxos provides no explanation as to the amount of AFI's business personal property valuation in front of the appraisal panel. (*See generally* Pl. Cross Mot.)

[16] AFI also makes confusing allegations that Naxos misrepresented its "business income loss" or its "lost income," but AFI does not explain how Naxos misrepresented its lost business income. (*See* Def. MSJ at 4-6, 21-22.) Thus, the court rejects this argument due to the absence of any support for it in AFI's briefing.

difference in damages claimed during the present proceeding and the prior bankruptcy proceeding is nothing more a blatant misrepresentation to American Family in an effort to obtain a greater monetary value.").)

The problem with this argument is that it confuses Naxos's representations to the bankruptcy court with Naxos's representations to AFI in the insurance claim. AFI cannot avoid liability under the Policy based on representations Naxos made in a bankruptcy proceeding unless the bankruptcy representations prove that Naxos subsequently made material misrepresentations to AFI. *See Ki Sin Kim*, 223 P.3d at 1188-89. But AFI did not submit any evidence showing that Naxos's representations to AFI about its business personal property were false. (*See* Def. MSJ at 4-6, 21-22.) AFI did not, for example, provide evidence showing that Naxos falsely claimed that it owned certain kitchen equipment or that Naxos misrepresented the value of certain equipment. (*See id.*) Instead, the evidence before the court shows that both parties performed independent valuations of Naxos's business personal property and submitted those valuations to a neutral appraisal panel in accordance with the Policy. (*See* Claims File at 78 (outlining AFI's valuation of Naxos's business personal property); Gaouette Decl. ¶¶ 20-21, Exs. B-C (detailing Naxos's valuation of its business personal property); Appraisal Award; Policy at NAXOS-AMFAM00208.) Viewed in the light most favorable to Naxos, a rational juror could conclude that this evidence shows that Naxos did not make any misrepresentations about the value of its business personal property in the insurance claim.

//

AFI's confusing arguments about the impact of Mr. Gauoette's testimony are also not persuasive. AFI alleges that Mr. Gaouette was "unable to adequately articulate the damages claimed by Naxos" and instead identified damages that had already been accounted for in the appraisal or damages that Naxos falsely claims to owe to vendors. (*See* Def. MSJ at 5-6.) AFI cites to deposition testimony from Mr. Gaouette showing that Mr. Gaouette believes that Naxos is entitled to additional payments from AFI related to certain third-party vendors, but AFI's claim that these damages "had already been accounted for during the appraisal process" or are not owed by Naxos are not supported by any citations to the record. (*See id.* (citing Gaouette Dep. at 122:1-17, 130:3-15).) AFI does not explain, however, how Mr. Gaouette's misstatements or inability to provide clarification of Naxos's position on damages during his deposition constitutes a material misrepresentation in Naxos's insurance claim. (*See id.*) Thus, the court concludes that AFI is not entitled to summary judgment on its claim for misrepresentation in the insurance claim based on Mr. Gaouette's damages testimony.

b.  *Naxos's Employee Payroll*

AFI also argues that Naxos misrepresented its payroll in its insurance claim. (*See* Def. MSJ at 6-7.) Specifically, AFI takes issue with Naxos's representations about three employees: Ms. Anderson, John Loukas, and William Loukas. (*Id.*) Evidence in the record raises red flags about each of these witnesses' involvement with Naxos. Naxos originally represented that it was paying Ms. Anderson "a salary of $1,200.00 that needs to be paid out of Naxos" (*see* Comstock Decl. ¶ 2, Ex. 12), but Ms. Anderson later claimed that her salary was $3,000 a month (*see* Claims File at 152, 154). William

Loukas claims that he has not done any regular work for Naxos since 2012. (*See* William Loukas Dep. at 36:8-14.) Moreover, William Loukas was in jail in September 2015, the time period in which he was allegedly drawing an $1,800 salary from Naxos. (*See id.* at 10:9-11:11, 36:22-37:23; Claims File at 152.) Although Naxos claimed that John Loukas was Naxos's "contract manager" (s*ee* Comstock Decl. ¶ 2, Ex. 10 at 19-30), he claimed during his deposition that his involvement with the sewage spill was largely limited to a handful of interactions with 1-800 Water Damage. (*See* John Loukas Dep. at 22:19-23:9, 66:16-67:9, 68:8-14, 71:8-10, 75:25-76:18, 78:10-79:1, 82:18-83:5.)

Although this testimony and some of the documents in AFI's Claim File provide persuasive evidence of misrepresentation, there are too many unresolved factual disputes to merit summary judgment in AFI's favor on this issue. AFI's claim file and Naxos's deposition testimony suggest that Ms. Anderson was heavily involved in Naxos's insurance claim. (*See, e.g.*, Claims File at 160-66; John Loukas Dep. at 82:17-22; Comstock Decl. ¶ 2, Ex. 12.) Naxos's payroll documentation from July 2014 to July 2015 indicates that Naxos regularly paid William Loukas in the year before the loss (Comstock Decl. ¶ 2, Ex. 10 at 31-37), and bankruptcy filings are consistent with Naxos's claims that William Loukas was drawing a salary from Naxos (*see* 8/22/19 Muth Decl. ¶ 3, Ex. B at 19, 28). It also appears that Naxos kept William Loukas informed of the sewage spill, and he went to the Property to inspect the loss once he was released from jail. (*See* William Loukas Dep. at 37:2-38:8, 40:25-41:3.) John Loukas testified that he went to the Property with Ms. Anderson a number of times and his testimony regarding his interaction with 1-800 Water Damage is consistent with Naxos's

representation that he helped Naxos manage contracts.  (*See* John Loukas Dep. at 22:19-23:9, 66:16-67:9, 68:8-14, 71:8-10, 75:25-76:18, 78:10-79:1, 82:18-83:5.) Moreover, although AFI's claims log indicates that Naxos supported its claims for payments owed to these individuals with "payroll documents," AFI inexplicably fails to identify those documents in the record.  (*See* Claims File at 152, 154; Def. MSJ at 6-7.) Thus, the only evidence in the record regarding Naxos's specific representations to AFI about its payroll comes from AFI's vague claim log entries (*see* Claims File at 152-154), which is insufficient to establish a material misrepresentation by clear, cogent, and convincing evidence.

Ultimately, the court concludes that this evidence highlights a number of genuine disputes of material fact on the existence of misrepresentations, materiality, and Naxos's intent that are properly for the jury to resolve.

        c.    *Prior Sewage Issues*

AFI also argues that Naxos misrepresented or concealed facts about prior sewage issues during the insurance claim.  (*See* Def. MSJ at 7-10.)  In support of this argument, AFI cites a number of code violations issued to Naxos by the city of Kent prior to the sewage spill and summarily concludes that these code violations show that Naxos "disregarded" the issues the city of Kent identified and attempted to "gloss over" them in its insurance claim.  (*See id.* (citing 12/5/19 Muth Decl. ¶¶ 7-10, Exs. F-I).)  Again, however, the problem with AFI's argument is that AFI fails to connect these prior sewage issues to Naxos's representations to AFI during the claim.  AFI does not show, for example, that AFI asked Naxos whether there had been prior sewage issues during the

claim process or that Naxos tried to conceal the prior violations from AFI. (*See id.*) In fact, the evidence shows that AFI knew that there had been a code violation at Naxos by September 25, 2015. (*See* Claims File at 164-65.) Thus, the court concludes that AFI has failed to identify any misrepresentations that Naxos made on this issue.[17] Therefore, AFI has not carried its burden to show that there is no genuine dispute of material facts on this particular alleged misrepresentation.

### d. *Naxos, LLC Membership*

AFI's next argument is that Naxos misrepresented the members of Naxos, LLC during the insurance claim. (*See* Def. MSJ at 10.) AFI claims that "Trina Loukas and [William] Loukas are listed as members of Naxos LLC" without citing any document or evidence in the record. (*See id.*) Thus, the court cannot determine what document AFI claims Trina and William Loukas are "listed" on or why that document has any relevance to Naxos's insurance claim. Thus, the court agrees with Naxos that "AFI[] has not provided any admissible evidence showing that Naxos made any representations—let alone misrepresentations—to AFIC regarding member interests in Naxos, LLC." (*See* Pl. Cross Mot. at 10.) On that basis, the court concludes that AFI has not carried its burden to establish that it is entitled to summary judgment on this alleged misrepresentation.

//

---

[17] AFI insinuates that Naxos's failure to respond to the city of Kent's violations was material because Naxos could have prevented the loss had it timely fixed the issues the city identified. (*See* Def. MSJ at 9-10.) But that argument, which is speculative and conclusory, is irrelevant to AFI's motion because it pertains to the cause of the loss—which is not at issue here—not Naxos's misrepresentations in the insurance claim.

e. *Naxos's Ownership of the Property*

Although AFI's motion is not a model of clarity on this issue, AFI appears to argue that Naxos made misrepresentations about the ownership of the Property during the insurance claim in addition to making misrepresentations on that topic during the application process. (*See* Def. MSJ at 3 ("Naxos made claims and received payments for damage to the building that was not owned by Naxos. Naxos never disclosed that it did not own the building. Naxos has continuously misrepresented and concealed the fact that they have never had any ownership interest in the building located at 215 1st Ave S.").) As discussed above, misrepresentations during the claim process are subject to a different standard of proof than misrepresentations in the application process. *Compare Ki Sin Kim*, 223 P.3d at 1188-89 (noting that the preponderance of the evidence standard for misrepresentations in an insurance claim) *with Queen City Farms*, 882 P.2d at 728 (noting that misrepresentations in an insurance application must be proven by clear, cogent, and convincing evidence). But AFI does not argue that Naxos made any specific misrepresentations about the ownership of the Property in the claim process. (*See* Def. MSJ at 2-4, 14-17.) Instead, the only specific misrepresentation AFI offers is Trina Loukas's alleged statement to Mr. Lim during the application process (*see* Def. MSJ at 2-4, 14-17), which the court has already addressed above, *see supra* § III.B.1. Although AFI also makes vague arguments that Naxos "concealed" and "never disclosed" the true ownership of the Property (*see* Def. MSJ at 3), AFI does not cite any law or evidence in the record in support of its argument that concealing or failing to disclose that Asimo Loukas owned the Property during the insurance claim constitutes a material

misrepresentation in Naxos's insurance claim (*see generally* Def. MSJ at 2-4, 14-17, 19-20).  Thus, the court concludes that there are genuine disputes of material fact regarding Naxos representations of its ownership interest in the Property that preclude entry of summary judgment.

f.  *Conclusion*

Ultimately, AFI's motion for summary judgment on misrepresentations in the insurance claim fails because AFI has not met its burden to show that there are no genuine disputes of material fact regarding Naxos's alleged misrepresentations in the insurance claim.

3.  Naxos's Insurable Interest in the Property

AFI argues that Naxos cannot recover under the Policy because it lacks an insurable interest in the Property.  Under the doctrine of insurable interest, an insurance contract is unenforceable if it is issued to a person who has no economic interest in the property being insured.  *See Gossett v. Farmers Ins. Co. of Wash.*, 948 P.2d 1264, 1269 (Wash. 1997).  "The purpose of the doctrine is to prevent insurance contracts from becoming a form of wagering or gambling, to protect against societal waste, and to prevent people without an insurable interest from intentionally destroying life or property for financial gain."  *Baker v. Phoenix Ins. Co.*, No. C12-1788JLR, 2013 WL 12109403, at *3 (W.D. Wash. Mar. 5, 2013) (citing *Gossett*, 948 P.2d at 1271-72).  RCW 48.18.040 defines an "insurable interest" as "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage."  RCW 48.18.040(2).  An insurable interest in property generally

arises when someone would profit or enjoy some advantage from property or would suffer loss from destruction of property. *CLS Mortg., Inc. v. Bruno*, 937 P.2d 1106, 1108 (Wash. Ct. App. 1997). In this inquiry, legal title is not dispositive, nor is possession, nor is the fact that the insured paid premiums. *Gossett,* 948 P.2d at 1269, 1272-73. Rather, the Washington State Supreme Court instructs trial courts to examine the purposes of the doctrine and see if they would be well-served by its application. *Id.* at 1272.

Naxos had an insurable interest in the Property. AFI's sole argument on this issue is that Naxos cannot have an insurable interest in a building that it merely leases. (*See* Def. MSJ at 17-19.) Although it is true that Naxos leased the Property from Asimo Loukas (*see* 12/27/19 Muth Decl. (Dkt. # 70) ¶ 5, Ex. D), AFI's argument ignores the relationship between Naxos and Asimo Loukas. Asimo Loukas is the sole owner of the Property and Naxos. (*See* Trina Loukas 30(b)(6) Dep. at 19:19-22:11; Trina Loukas Dep. at 36:13-15; Comstock Decl. ¶ 2, Ex. 7.) As the sole member of Naxos, she is an insured under the Policy. (*See* Policy at NAXOS-AMFAM00222 (noting that "members" of an LLC are insureds "with respect to the conduct of [the LLC's] business").) Asimo Loukas had a "lawful and substantial economic interest" in the Property as its owner. *See CLS Mortg., Inc.*, 937 P.2d at 1108 (noting that plaintiff "clearly had an insurable interest when it held the promissory note and Deed of Trust" to property at issue). If Asimo Loukas had a "lawful and substantial economic interest" in the Property, so does the company that Asimo Loukas solely owns. *See Wade T. Verges Const. Co. v. Am. Empire Surplus Lines Ins. Co.*, No. CIV.A. 07-4303, 2008 WL 4889718, at *2 (E.D. La. Nov. 10, 2008) (denying defendant's motion for summary judgment on the insurable interest

doctrine because "[l]ogic dictates" that the company named as an insured on an insurance policy holds an insurable interest in property owned by another company where both companies were solely owned by same individual). Given the inextricable economic relationship between Naxos and Asimo Loukas, the court concludes that the purposes that gave rise to the insurable interest doctrine—"prevent[ing] insurance contracts from becoming a form of wagering or gambling," "protect[ing] against societal waste," and "prevent[ing] people without an insurable interest from intentionally destroying life or property for financial gain," *see Baker*, 2013 WL 12109403, at *3 (citations omitted)— are not present here.

Moreover, even if the court were to set aside the relationship between Asimo Loukas and Naxos, the court would still deny AFI's motion. AFI concedes that Naxos has at least some insurable interest in the Property. (*See* Def. MSJ at 18 ("Naxos as a tenant of Asimo Loukas does not have a complete insurable interest in the property. Rather, Naxos' only insurable interest in the property is limited to the value of the remaining right of use or occupancy of the building.").) In light of AFI's concession that Naxos did have an insurable interest in the Property—even if only a partially insurable interest—the court cannot grant summary judgment and conclude that Naxos has no insurable interest in this Property.

### 4. Conclusion

The court concludes that AFI has not carried its burden to establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

//

1 matter of law." Fed. R. Civ. P. 56(a).  Thus, AFI's motion for summary judgment in

2 DENIED.[18]

## C.    Naxos's Cross-Motion for Summary Judgment

4        Naxos's cross-motion for summary judgment seeks summary judgment on the

5 same claims and affirmative defenses that AFI based its motion on—AFI's claims for

6 fraud and misrepresentation.  (*See* Pl. Cross Mot. at 1 ("Naxos . . . asks the [c]ourt to

7 grant its motion for cross-relief dismissing [AFI's] counterclaims and affirmative

8 defenses that are based on fraud and misrepresentation.")  As a threshold matter, the court

9 notes that Naxos filed its cross-motion for summary judgment after the deadline for

10 dispositive motions without permission from the court.  (*See* Sched. Order (Dkt. # 14) at

11 1 (stating that "[a]ll dispositive motions" must be filed by December 10, 2019).)  Further,

12 because Naxos had already filed its own motion for summary judgment (*see* Pl. MSJ),

13 Naxos's cross-motion is a contemporaneous dispositive motion, which the court

14 disfavors.  *See* Local Rules W.D. Wash. LCR 7(e)(3) ("Absent leave of the court, a party

15 must not file contemporaneous dispositive motions, each one directed toward a discrete

16 issue or claim.").)  However, AFI did not move to strike the cross-motion.  (*See generally*

17 Def. Reply.)  Further, with the exception of Naxos's argument that AFI should be

18 estopped from denying coverage (*see* Pl. Cross Mot. at 22), Naxos's cross-motion does

19 //

20

21

22

___

[18] Because the court denies AFI's motion for summary judgment and does not rely on
Ms. Ewers' deposition errata, the court concludes that it need not address Naxos's request to
strike Ms. Ewers's errata as a "sham" deposition.  (*See* Surreply at 1-3.)

not introduce claims or issues that AFI did not address in its motion.[19]  (*See generally* Pl. Cross Mot.)  Instead, it is essentially the mirror image of AFI's motion for summary judgment on misrepresentation in the insurance application and insurance claim that the court considers above in detail.  Accordingly, the court will consider the cross-motion on AFI's misrepresentation claims for the sake of judicial efficiency.

       1.     <u>Misrepresentation in the Application</u>

The court denies Naxos's cross-motion on AFI's claims of misrepresentation or fraud based on Naxos's alleged misrepresentations in its insurance application.  Because AFI carries the burden on these claims, Naxos must either negate an element of AFI's claim or show that Naxos does not have sufficient evidence to prove its claims at trial. *See Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102 (citations omitted).  Here, Naxos does neither.

In addition to the fact that the Policy states that the Property is "Owner Occupied," (*see* Policy at NAXOS-AMFAM00186), Mr. Lim's declaration states that Trina Loukas specifically represented that Naxos owned the Property during the insurance application. (*See* Lim Decl. ¶ 4.)  That evidence creates a genuine dispute of material fact on whether Naxos made a misrepresentation during the application process.  Although Naxos challenges the veracity of Mr. Lim's declaration (*see* Pl. Cross Mot. at 5), credibility challenges are best reserved for the trier of fact.  *See Anderson*, 477 U.S. at 255

---

[19] Naxos raised an estoppel argument in its motion for summary judgment.  (*See* Pl. MSJ at 19-20.)  As such, the court considers that argument in relation to Naxos's motion and limits its consideration of Naxos's cross-motion to the misrepresentation issues that are common to both the cross-motion and AFI's motion for summary judgment.

("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]").

Mr. Lim's declaration also states that Trina Loukas's representation was important to AFI in moving forward with Naxos's application. (*See* Lim Decl. ¶¶ 5-7.) Similarly, Mr. Vang states that he is familiar with AFI's underwriting policies and that AFI would not have issued the Policy had it known that Naxos did not own the Property. (*See* Vang Decl. ¶¶ 1, 4-6.) The court rejects Naxos's argument that it should disregard Mr. Vang's declaration in light of the majority's decision in *Queen City Farms*. *See* 882 P.2d at 728-32 (Brachtenbach, J.). As discussed in detail above, the majority's conclusion in that case—which Naxos cites in support of its argument that Mr. Vang's declaration is inadequate as a matter of law to establish materiality (*see* Pl. Cross Mot. at 16)—is a dissenting opinion on the material misrepresentation issue. *See supra* § III.B.1, n.11. Justice Utter's opinion, which garnered a majority on the material misrepresentation issue, concluded that materiality should have been left to the jury. *See Queen City Farms*, 882 P.2d at 733-36 (Utter, J., dissenting) ("Because evidence was presented from which the jury reasonably could have inferred a material misrepresentation was made, we should respect the jury's finding of fact on this issue."). The court reaches the same conclusion here. Materiality is a question of fact. *See Cutter & Buck, Inc.*, 306 F. Supp. 2d at 1003. Naxos has presented enough evidence of materiality to send this issue to a jury.

Finally, there is also a dispute of material fact regarding Naxos's intent to deceive AFI. Naxos argues that AFI "presents no evidence showing that any alleged

misrepresentation was made knowingly with intent to deceive." (*See* Pl. Cross Mot. at 17.) Not so. Naxos's bankruptcy schedules, which were first filed in August 2014, state that Naxos did not own any real property. (*See* 8/22/19 Muth Decl. ¶ 4, Ex. C at 43.) This evidence suggests that Naxos understood that there was a legal distinction between property owned by Asimo Loukas in her personal capacity and property owned by Naxos, LLC. Based on this evidence, a rational juror could conclude that Naxos knowingly misrepresented its ownership interest in the Property, which triggers a presumption that the statement was made with intent to deceive that Naxos must rebut with credible evidence that the misstatements were not made with intent to deceive. *Cutter & Buck, Inc.*, 306 F. Supp. 2d at 1004 (citations omitted).

Ultimately, the court concludes that there are genuine disputes of fact that prevent the court from entering summary judgment on misrepresentation, materiality, and Naxos's intent on the specific issue of whether Naxos made misrepresentations in its insurance application.

### 2. Misrepresentations in the Insurance Claim

Based on the factual disputes that the court detailed in addressing AFI's motion for summary judgment on misrepresentations in the insurance claim, *see supra* § III.B.2, the court concludes that Naxos has not met its burden to show that it is entitled to summary judgment on AFI's claim of misrepresentation in its insurance claim. Because Naxos is the movant on its cross-motion, the facts in the record regarding Naxos's representations in the insurance claim must be viewed in the light most favorable to AFI. *See Scott*, 550 U.S. at 378. The court will not retread through each of AFI's alleged

misrepresentations and the facts relating to these misrepresentations.  Instead, the court concludes that the evidence in the record—viewed in AFI's favor—raises genuine disputes of material fact on AFI's claim for misrepresentations in the insurance claim that preclude summary judgment.

**D.      Naxos's Motion for Partial Summary Judgment on AFI's Liability**

In addition to its cross-motion for summary judgment, Naxos filed a motion for partial summary judgment on AFI's liability.  (*See* Pl. MSJ at 1.)  Naxos acknowledges that material disputes of fact prevent the court from awarding summary judgment on its claims for insurance bad faith, negligent claims handling, violation of the CPA, and violation of IFCA, but asks the court to award partial summary judgment on AFI's liability on each of those claims.  (*See id.*)  Additionally, Naxos argues that AFI should be estopped from disputing the coverage award issued by the appraisal panel.  (*See id.* at 20-21.)  Although AFI's response briefly contests Naxos's claims on the merits (*see* Def. Resp. at 20-21), the majority of AFI's response recycles the same misrepresentation arguments AFI made in support of its motion for summary judgment (*see id.* at 2-12, 14-20).

1.      <u>AFI's Misrepresentation Arguments</u>

The court first addresses the impact of the court's conclusion that summary judgment is not warranted on AFI's misrepresentation claims on Naxos's motion for partial summary judgment.  AFI argues that the court cannot grant Naxos's motion for partial summary judgment on its IFCA, CPA, bad faith, and negligent claims handling claims so long as AFI has live claims for misrepresentation.  (*See* Def. Resp. at 14-17.)

The court agrees. While "bad faith and CPA claims may still lie even in the absence of coverage under an insurance policy . . . an insured that perpetrates a fraud upon the insurer is precluded from pursuing either a bad faith or CPA claim." *Tudor Ins. Co. v. Hellickson Real Estate*, 810 F. Supp. 2d 1211, 1218-19 (W.D. Wash. 2011); *Ki Sin Kim*, 223 P.3d at 1189 ("When an insured intentionally makes material misrepresentations regarding a claim for insurance coverage, any claim by the insured against the insurance company for bad faith and CPA violations must fail."); *Cox*, 757 P.2d at 504 (observing that the purpose of the CPA would not be served by providing "a windfall to [an insured] guilty of fraud"); *Reverse Now VII, LLC v. Oregon Mut. Ins. Co.*, 341 F. Supp. 3d 1233, 1240 (W.D. Wash. 2018) ("Having concluded that the Policy is void as a matter of law, and having granted Oregon Mutual's motion with respect to misrepresentation and concealment, the Court does not reach Reverse Now's breach of contract, IFCA, and WAC claims."). Thus, the court's decision to deny AFI's motion for summary judgment and Naxos's cross-motion for summary judgment precludes the court from concluding as a matter of law that AFI is liable on Naxos's IFCA, CPA, bad faith, and negligent claims handling claims.

However, in the event that AFI fails to prove its misrepresentation claims at trial, Naxos will be entitled to pursue its IFCA, CPA, bad faith, and negligent claims handling claims. Although the court's ruling on the parties' cross-motions on misrepresentation prevents the court from awarding summary judgment in Naxos's favor on AFI's liability on any of its claim, the court may enter partial summary judgment on specific portions of Naxos's claim. *See* Fed. R. Civ. P. 56(g); *Almendarez v. BNSF Ry. Co.*, No.

C13-0086-MAT, 2014 WL 931530, at *7 (W.D. Wash. Mar. 10, 2014) ("Pursuant to Federal Rule of Civil Procedure 56(g), if the Court declines to grant the relief requested by a motion for summary judgment, 'it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.'") (citing Fed. R. Civ. P. 56(g)). The court believes it is in the interest of the parties and the court to consider Naxos's motion on the merits and determine whether there are any issues that the court can resolve as a matter of law in order to streamline the parties' efforts at trial.

   2.   AFI's Liability Arguments

      a.   *Insurance Bad Faith*

   Claims for insurer bad faith "are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty. In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (citing *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 169 P.3d 1, 8 (Wash. 2007)). Naxos bases its claim for insurance bad faith on three provisions of the Washington Administrative Code that regulate insurance claim handling in Washington—WAC 284-30-330(4), WAC 284-30-330(7), and WAC 284-30-370. (*See* Pl. MSJ at 11-16.) Any violation of these regulations constitutes a breach of the duty of good faith an insurer owes to an insured. *See Rizzuti v. Basin Travel Serv. of Othello, Inc.*, 105 P.3d 1012, 1019 (Wash. Ct. App. 2005).

//

WAC 284-30-330 defines a number of "unfair methods of competition and unfair or deceptive acts or practices," including "[r]efusing to pay claims without conducting a reasonable investigation" and "[c]ompelling a first party claimant to initiate or submit to litigation, arbitration, or appraisal to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in such actions or proceedings." WAC 284-30-330(4), -330(7). WAC 284-30-370 states:

> Every insurer must complete its investigation of a claim within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time. All persons involved in the investigation of a claim must provide reasonable assistance to the insurer in order to facilitate compliance with this provision.

WAC 284-30-370. The court addresses each of these Washington Administrative Code Provisions in turn.

i.      WAC 284-30-370

The court concludes that Naxos carries its initial summary judgment burden to "establish beyond controversy," *see S. Cal. Gas Co.*, 336 F.3d at 888 (9th Cir. 2003) (internal quotation marks and citation omitted), that AFI's investigation violated WAC 284-30-370. During the 30-day period in which AFI was required to complete its investigation unless it was not "reasonable" to do so, *see* WAC 284-30-370, AFI failed to hire a plumber, an engineer, industrial hygienist, or other expert to investigate the loss and assist with AFI's coverage determination during the 30-day window. (*See* Claims File at 167-171.) The only vendor that AFI hired within the 30-day period, Servpro—who AFI did not hire until two weeks after the loss—was not asked to determine the cause of the loss or prepare a repair estimate. (*See* Daigle 30(b)(6) Dep. at

189:19-190:5.)  Instead, AFI asked Servpro asked to review 1-800 Water Damage's proposed scope of work for the remediation project.  (*See* Claims File at 169.)  On August 24, 2015—nearly three weeks after the loss—Servpro agreed "100 percent" with 1-800 Water Damage's scope of work.  (Daigle 30(b)(6) Dep. at 190:12-23.)  Servpro concluded that there was contaminated sewage water seeping through the flooring and drywall at Spiros, a "heavy infestation of flies," and "maggots in the crawlspace."  (*See* Claims File at 169; Daigle 30(b)(6) Dep. at 190:24-191:19.)  1-800 Water Damage provided an estimate on August 27, 2015, and asked AFI on multiple occasions during the 30-day period for permission to proceed with remediations efforts.  (*See* Daigle 30(b)(6) Dep. at 182:19-186:1, 188:19-189:18, 192:7-11, 197:9-200:5.)  AFI rebuffed these requests.  (*See id.*)

On September 4, 2015—the 30th day after the loss—AFI hired an independent adjuster, Mr. Hanley, to inspect the loss.  (*See* Claims File at 167-68.)  Mr. Hanley provided a report to AFI within a week of his hiring.  (*See id.* at 167.)  On September 11, 2015, the same day Mr. Hanley provided his report, AFI concluded it needed to hire an engineer to investigate the cause of the loss due to concerns over the "sizeable loss potential" and the importance of "get[ting] clear on coverage."  (*See id.*)  That same day, AFI issued a reservation of rights to Naxos that informed Naxos that AFI believed there was "a question" as to whether the Policy would cover the loss.  (*See id.* at 189.)  AFI's engineer, Mr. Thomas continued to investigate the loss until October 1, 2015, when AFI eventually contacted Naxos to inform Naxos that it would cover the loss.  (*See id.* at

//

161-66.)  Although AFI conceded coverage on October 1, 2015, AFI never determined the cause of the loss.  (*See* Daigle 30(b)(6) Dep. at 130:21-23.)

There is no dispute that AFI failed to "complete" its investigation within 30 days as WAC 284-30-370 requires.  (*See* Daigle Dep. at 212:13-25.)  Indeed, the record detailed above shows that AFI did next to nothing to investigate the loss during the 30-day period and assumed Naxos would investigate its own loss.  Once AFI hired Mr. Hanley and Mr. Thomas, AFI began making steps toward completing its investigation. Indeed, AFI conceded coverage less than 30 days after Mr. Boe retained Mr. Hanley to adjust the loss and only three weeks after AFI decided it was important to "get clear on coverage" and hire Mr. Thomas.  (*See* Claims File at 162-67.)  But by the time AFI hired Mr. Hanley and Mr. Thomas, AFI's opportunity to comply with Washington law had passed.  As such, the court concludes that Naxos has carried its initial burden to establish that AFI's initial investigation of the loss was sufficiently "unreasonable, frivolous, or unfounded" to establish bad faith as a matter of law under WAC 284-30-370.  *See Onvia, Inc.*, 196 P.3d at 668.

AFI fails to respond with sufficient evidence to create a material dispute of fact on its bad faith violation of WAC 284-30-370.  Although WAC 284-30-370 does not require insurers to complete an investigation within 30 days if "the investigation cannot reasonably be completed within that time," the only argument that AFI offers on this point is that Naxos's failure to provide a report from its plumber or produce the broken piece of pipe that led to the sewage spill made it "impossible" to determine the cause of the loss.  (*See* Def. Resp. at 20-21.)  AFI provides no citations to the record or expert

testimony in support of its argument that the plumbing report hamstrung the entire claims investigation. (*See id.*) AFI does not explain, for example, why it failed to hire its own plumber—or any other expert, for that matter—to investigate the loss if a plumber was so crucial to determining cause. (*See id.*) Nor does AFI detail what efforts it made to contact or identify Naxos's plumber beyond merely relying on Naxos to try to obtain a report from the plumber. (*See* Daigle Dep. at 177:22-178:21.) Moreover, although the record indicates that Ms. Anderson informed AFI that she would attempt to obtain a plumbing report on August 17, 2015, AFI did not follow up with Ms. Anderson until Mr. Thomas asked Ms. Anderson for documentation on September 14, 2015—long after the 30-day period had expired. (*See* Claims File at 167-70.)

Although "[w]hether an insurer acted in bad faith is a question of fact," which can be decided on summary judgment only if reasonable minds could not differ in finding the insurer's conduct unreasonable," *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash. 2003), the court concludes that reasonable minds could not differ on AFI's liability for insurance bad faith under WAC 284-30-370. Thus, the court concludes that Naxos is entitled to partial summary judgment on the issue of whether AFI acted in bad faith by violating WAC 284-30-370. Pursuant to Naxos's request, the court reserves the question of what damages, if any, were caused by this violation for trial. (*See* Pl. MSJ at 1.)

ii.     WAC 284-30-330(4)

Although the court concludes that AFI failed to conduct a timely investigation as required by WAC 284-30-370, it does not follow that AFI also violated WAC 284-30-330(4)'s prohibition on "[r]efusing to pay claims without conducting a reasonable

investigation." The central problem with Naxos's argument is AFI did not refuse to pay Naxos's claims. By October 1, 2015, AFI confirmed that it would provide coverage for Naxos's loss. (*See* Claims File at 162.) The court recognizes that AFI did not pay as much or as promptly as Naxos would have preferred. But, as set forth in detail above, AFI provided estimates throughout the lifecycle of the repair process, consistently paid Naxos for business income loss during the year in which it was entitled to those payments, participated in the appraisal process provided for under the Policy once Naxos invoked its right to an appraisal, and complied with the appraisal award after it was issued. *See supra* § II.D-E. Thus, Naxos has not shown that AFI denied coverage or refused to pay Naxos amounts owed under the Policy. Accordingly, the court concludes that Naxos has not established as a matter of law that AFI violated WAC 284-30-330(4). *See Lains v. Am. Family Mut. Ins. Co.*, No. C14-1982-JCC, 2015 WL 4523294, at *2 (W.D. Wash. July 27, 2015) (concluding that material dispute of fact precluded summary judgment on insured's claim for violation of WAC 284-30-330(4) despite evidence that insurer had delayed investigation because insurer had "never refused to make a payment" and had "provide[d] repair estimates" during the adjustment process).

iii.    WAC 284-30-330(7)

The court concludes that material disputes of fact prevent the court from determining that AFI violated WAC 284-30-330(7). Establishing a violation of WAC 284-30-330(7) requires "something more" than merely identifying a disparity between an insurer's offer and an award ultimately obtained at an arbitration or an appraisal. *See Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 483 (Wash. 2017). Even

where an insured establishes that an insurer's offer was too low, "[t]he issue turns on whether the insurer had reasonable justification for its low settlement offer." *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1036 (Wash. Ct. App. 2000). "The ultimate issue of the reasonableness of the offer is for the finder of fact to determine." *Id.*

As discussed above in detail, both parties in this case hired multiple third-party experts to provide valuations of Naxos's insurance claim throughout this adjustment period. *See supra* § II.E. Although the appraisal panel ultimately determined that AFI had underpaid Naxos on its claim for benefits, the court will not invade the province of the jury by determining the reasonableness of AFI's conduct on summary judgment. Instead, the court concludes that Naxos has not carried its burden to establish as a matter of law that AFI violated WAC 284-30-330(7).

> b.    CPA

The elements of a CPA action are "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Bain v. Metro. Mortg. Grp., Inc.*, 285 P.3d 34 (Wash. 2012). "In terms of the first element, an insurer's bad faith conduct or its violation of any subsection of WAC 284–30–330 constitutes a *per se* unfair trade practice." *Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1238 (W.D. Wash. 2008). Similarly, the second and third elements are met in any insurance case alleging unfair claims practices. *Id.*

As is it did for its insurance bad faith claim, Naxos bases its CPA claim entirely on AFI's alleged violation of WAC 284-30-330(4), WAC 284-30-330(7), and WAC

284-30-370. (*See* Pl. MSJ at 11-16.) Thus, based on the courts conclusion on Naxos's claim for insurance bad faith, *see supra* § III.D.1.a, the court concludes that Naxos has established an "unfair or deceptive act or practice" under the CPA pursuant to AFI's violation of WAC 284-30-370. Pursuant to Naxos's request, the court reserves the question of whether Naxos can establish injury and causation for trial. (*See* Pl. MSJ at 1.) The court also concludes that Naxos has not established an "unfair or deceptive act or practice" under the CPA insofar as that claim is based on violations of WAC 284-30-330(4) and WAC 284-30-330(7).

### c. *IFCA*

Under IFCA, "an insured 'who is unreasonably denied a claim for coverage or payment of benefits by an insurer' may sue to recover actual damages and costs." *Kabrich v. Allstate Prop. & Cas. Ins. Co.*, 693 F. App'x 524, 526 (9th Cir. 2017) (citing RCW 48.30.015(1) & *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 479 (Wash. 2017)). An IFCA claim does not require evidence of "an outright denial of a claim for benefits under the policy." *Morella v. Safeco Ins. Co. of Ill.*, No. C12-0672RSL, 2013 WL 1562032, at *3 (W.D. Wash. Apr. 12, 2013). Instead, even where an insurer accepts coverage, an insured may maintain an IFCA cause of action "[w]here the insurer pays or offers to pay a paltry amount that is not in line with the losses claimed, is not based on a reasoned evaluation of the facts (as known or, in some cases, as would have been known had the insurer adequately investigated the claim), and would not compensate the insured for the loss at issue, the benefits promised in the policy are effectively denied." *Id.* "If, on the other hand, the insurer makes a reasonable

payment based on the known facts or is making a good faith effort to appropriately value the loss, the fact that the insured did not immediately get all of the benefits to which it may ultimately be entitled does not establish an 'unreasonable denial of payment of benefits.'" *Id.* (citations omitted).

Naxos has not carried its burden to establish that there is no genuine dispute of material fact on its IFCA claim. Although the court concludes that Naxos has established a violation of WAC 284-30-370, IFCA does not create an independent cause of action for regulatory violations in the absence of any unreasonable denial of coverage or benefits. *Perez-Crisantos*, 389 P.3d at 483. Thus, the key question on Naxos's IFCA claim is whether AFI's handling of Naxos's insurance claim was so deficient that it rises to the level of an "unreasonable denial of payment of benefits" under RCW 48.30.015(1). The court concludes that that is a matter for the jury to resolve at trial.

        d.    *Negligent Claims Handling*

Although Washington caselaw on negligent claims handling is sparse, "[a] claim for negligent claims handling exists in Washington." *Merriman v. Am. Guarantee & Liab. Ins. Co.*, 396 P.3d 351, 362 (Wash. Ct. App. 2017). Moreover, although "[t]he analysis of a negligence cause of action is essentially the same as that of a claim of bad faith," *Cardenas v. Navigators Ins. Co.*, 2011 WL 6300253, at *8 (W.D. Wash. Dec. 16, 2011) (citing *Hamilton v. State Farm Ins. Co.*, 523 P.2d 193 (Wash. 1974)), under Washington law, negligence and bad faith are "separate and distinct" causes of action, *Oregon Mut. Ins. Co. v. Seattle Collision Center*, Inc., 2009 WL 3067036, at *12 (W.D. Wash. Sept. 18, 2009); *First State Ins. Co. v. Kemper Nat'l Ins. Co.*, 971 P.2d 953, 959

(Wash. Ct. App. 1999) (concluding that parties are entitled to claims for both bad faith and negligence because "a party may fail to use ordinary care yet still not act in bad faith"). Like all negligence claims, a cause of action for negligent claims handling requires a showing of duty, breach, injury, and causation. *See Grant v. Unigard Indem. Co.*, No. CV14-00198 BJR, 2015 WL 11233201, at *4 (W.D. Wash. Mar. 13, 2015) (citations omitted).

Although Naxos's negligent claims handling cause of action requires only that Naxos show that AFI failed to exercise "ordinary care," *First State Ins. Co.*, 971 P.2d at 959, the lower standard of proof does not change the court's conclusion on Naxos's claim. Because AFI violated WAC 284-30-370, the court concludes that Naxos has established the duty and breach elements of its negligent claims handling cause of action insofar as that cause of action pertains to WAC 284-30-370. Pursuant to Naxos's request, the court reserves the question of what damages, if any, were caused by that violation for trial. (*See* Pl. MSJ at 1.) To the extent that Naxos bases its negligent claims handling cause of action on WAC 284-30-330(4), WAC 284-30-330(7), or some other aspect of AFI's handling of Naxos's claim (*see* Pl. MSJ at 17-18), the court concludes that Naxos has not established any portion of its negligent claims handling claim.

3. <u>Estoppel</u>

Naxos's estoppel argument is perplexing in that it appears to seek to estop AFI from taking a position that AFI has not adopted or advanced. Naxos asks the court to estop AFI from denying insurance coverage because AFI participated in the appraisal process and the appraisal award is binding. (*See* Pl. MSJ at 18-20.) But this is not a

coverage dispute. Indeed, as AFI points out, "[c]overage was accepted by [AFI] from the outset and was never pulled." (*See* Def. Resp. at 20.) Although AFI argues at length that Naxos made misrepresentations in its insurance application and in the insurance claim, AFI has not asked this court to unwind the appraisal or to rescind the Policy and force Naxos to repay coverage benefits it has already received. (S*ee generally* Def. MSJ.) The first element of a claim for estoppel is "an admission, statement, or act inconsistent with the claim afterwards asserted." *Saunders v. Lloyds of London, et al.*, 779 P.2d 249 (Wash. 1989). Naxos has not shown that AFI has taken any such inconsistent action. Accordingly, the court concludes that Naxos is not entitled to partial summary judgment on its estoppel claim.

**E.      Summary**

The court concludes that neither party is entitled to summary judgment on AFI's claims for misrepresentation in the insurance application and the insurance claim. Accordingly, AFI may pursue those claims at trial. Although the court's decision to deny the parties' cross-motions on AFI's misrepresentation claims prevents the court from granting summary judgment on AFI's liability for Naxos's bad faith, IFCA, CPA, and negligent claims handling claims, the court concludes that Naxos has established as a matter of law that AFI violated WAC 284-30-370. Thus, the court grants partial summary judgment pursuant to Federal Rule of Civil Procedure 56(g) and considers it conclusively proven that AFI violated WAC 284-30-370. The court otherwise denies Naxos's motion for partial summary judgment on AFI's liability for Naxos's bad faith, IFCA, CPA, and negligent claims handling claims.

# IV. CONCLUSION

For the reasons set forth above, the court DENIES AFI's motion for summary judgment (Dkt. # 56) and DENIES Naxos's cross-motion for summary judgment (Dkt. # 67).  The court also GRANTS in part and DENIES in part Naxos's motion for partial summary judgment (Dkt. # 60).  Specifically, the court grants Naxos's motion for partial summary judgment on the specific issue of whether AFI's investigation violated WAC 284-30-370 and otherwise denies Naxos's motion.

Dated this 18th day of February, 2020.

_____

JAMES L. ROBART
United States District Judge